IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 18, 2008

**STATE OF TENNESSEE v. DEBBIE DAWN WALES**

**Direct Appeal from the Circuit Court for Giles County**
**No. 12,505     Stella L. Hargrove, Judge**

**No. M2007-01231-CCA-R3-CD - Filed 12/11/2008**

The Defendant pled guilty to theft of property in excess of $60,000, and the trial court sentenced her to ten years in prison and ordered her to pay $162,603 in restitution. The Defendant appeals, claiming that the restitution amount is excessive. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

Robert W. Wedemeyer, J., delivered the opinion of the court, in which Jerry L. Smith and Norma McGee Ogle, JJ., joined.

Robert H. Stovall, Jr., Pulaski, Tennessee, for the Appellant, Debbie Dawn Wales.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Clarence E. Lutz, Assistant Attorney General; Mike Bottoms, District Attorney General; and Patrick S. Butler, Assistant District Attorney General, for the Appellee, the State of Tennessee.

**OPINION**

**I. Facts**

A Giles County Grand Jury indicted the Petitioner on theft of property valued at over $60,000. At the hearing on the Petitioner's guilty plea to that charge, the State informed the trial court that, had the case gone to trial, the evidence would have shown:

> [B]etween the months of May[] 2002, and November 2005, [the Defendant], while in the scope of her employment, did take from her employer a sum of money in excess of $60,000.00, which I believe is the statutory amount to get it into a Class B felony range.

Additionally, in response to questioning from the trial court, the Defendant stated that she graduated from high school and accumulated approximately twenty-six college credits. She worked at Hillside Hospital as a remittance specialist for six years and made $10.25 per hour. The Defendant explained that her job required her to post insurance payments and patient payments. Before working at the hospital, she worked at Johnson Controls and at fast food restaurants. After hearing the evidence and verifying the Defendant's plea was voluntarily and knowingly entered, the trial court accepted the Defendant's guilty plea, imposed the agreed ten year prison sentence and set a hearing date to determine the amount of restitution.

At the restitution hearing, the following evidence was presented: William Scott Duvall, the director of ethics and compliance for Hillside Hospital, testified that in 2005 he became aware of a theft at Hillside Hospital. Duvall said the Defendant was "receiving cash from patients . . . paying bills" and also from the cafeteria's cash flow. The Defendant's initials and login name were next to the entries on the payment system. Duvall said there were discrepancies in the amount of cash received versus the amount deposited. He said, "[T]he discrepancies were cleared by zeroing out patient accounts or putting refunds in patient accounts that were old." He also said, "[A]ll of those entries had [the Defendant's] initials, [which were a part of] her login information[,] next to them." Duvall estimated the hospital's losses at: $87,952 in 2002; $94,796 in 2003; $98,324 in 2004; and $102,796 in 2005. He admitted the hospital received $16,000 to $19,000 from its insurance company as reimbursement after it met its $500,000 deductible.

On cross-examination, Duvall testified that he did not know the hospital's insurance deductible from 2000-2005 and that he did not know the insurance company's involvement with the hospital. He also said the Defendant had two supervisors, both of whom denied involvement in the theft. Duvall said the Defendant would post a payment to one account and then issue cash to another patient's account. He said she did this with about 1200 patients, but he did not verify this procedure with each patient whose account she used.

On redirect-examination, Duvall testified that the hospital did not regularly pay cash refunds to patients. He also stated that the Defendant lacked authority to make cash refunds to patients. Additionally, Duvall noted that the Defendant paid money into patient accounts that had been inactive for at least six months.

Special Agent Brad Elliott with the Tennessee Bureau of Investigation testified that he interviewed the Defendant, and she confessed to embezzling funds after being read her *Miranda* rights. The Defendant told him that she made "[c]ontractual and insurance adjustments to accounts." In his words, "She stated she pulled the money off, posted insurance, contractual, or adjustment to zero the balance." "She didn't actually make the deposits. She filled the deposits out, put all of the money together and someone else would actually carry the deposit bag into the bank." Agent Elliott said he subpoenaed the Defendant's bank records, which showed large amounts of money being deposited. When Agent Elliott tried locating the Defendant's assets, he found a home valued at $65,000 to $75,000; vehicles; a motorcycle; and a boat. He said she still owed money on the house.

The Defendant told agent Elliott that she bought "everyday" things with the money she stole. Agent Elliott also said the Defendant earned $35,000 to $36,000 a year from her job.

On cross-examination, Agent Elliott testified that, in addition to her yearly salary, the Defendant deposited into her personal bank account about $162,000 over the five-year span. He said she stole enough money each year to create a "salary" of $60,000.

Jim Edmondson, an administrator at Hillside Hospital, testified that the Defendant's job was to "take cash and payments that were made and prepare a deposit slip and to post these payments to patient[s'] accounts." On cross-examination, Edmondson said he would not rehire the Defendant at $25,000 a year, and he would not recommend her to other employers at $25,000 a year. He then qualified that statement, saying he was not sure whether he would "feel the same" in eight to ten years. When later called back to the stand, Edmondson admitted it was "reasonable" that the Defendant was authorized to make cash refunds for patients with private rooms.

The Defendant testified that she was thirty-seven years old, and had begun serving the ten year sentence for theft. She obtained her "GED" and two years of college credits. The Defendant recited that, before her job at the hospital, she worked six years at the Johnson Controls factory, and before that as an intern manager at a fast food restaurant. Working for the hospital, the Defendant earned $10.25 an hour, which amounted to around $20,000 to $25,000 a year. She has two sons, ages seventeen and nineteen, and has no physical or medical limitations. The Defendant agreed that she should be able to get a minimum wage job after being released from prison. She then listed her expected monthly expenses, which included: $400 for rent, $250 to $300 for utilities, $300 for food, $200 for transportation, $50 for clothing, and $50 for medical expenses. The Defendant said she also owes Home Depot $1000 and agreed that there is a "substantial possibility" that she will have to pay taxes on the money she stole. She also said she would be sharing the rent and utilities with her husband, making the total for her monthly expenses around $1000. The Defendant said that with a minimum wage job, she expects to earn between $900 and $1000 a month. The Defendant testified that she thought she would be able to pay $25 or $30 a week for restitution.

On cross-examination, the Defendant stated that her husband was unemployed, but he had earned $7 an hour at his previous job. She also said she has not had any disciplinary problems in prison. If she were granted parole after serving thirty percent of her sentence at prison, she would still have approximately seven years and four months to pay restitution. The Defendant said her college classes were in business and accounting. She admitted she could return to work at the factory, where she earned $10.25 an hour. The Defendant said she previously owned a Dodge Durango, but she and her husband sold it. Her husband has a small fishing boat and at some point also owned a recreational vehicle.

On redirect-examination, the Defendant testified that her boss gave her permission to make cash refunds to patients. She also said that when she earned $10.25 an hour at the factory, she was not a convicted felon; she believed she would only be able to earn $6 an hour because of her status as a convicted felon.

3

When answering the court's questions, the Defendant admitted that she alone embezzled from the hospital. The Defendant affirmed that she had previously given a statement to law enforcement in which she said she took full responsibility for the crime, and in which she stated: "I am willing to pay back the money." The Defendant testified that her statement is true.

Additionally, the following exchange occurred between the trial court and the Defendant:

**The Court**: Now, at some point you filled out an indigency form and you were appointed a lawyer that the taxpayers are paying for you; right?

**The Witness**: Yes, ma'am.

**The Court**: And on this form, I don't see where you show you got any cash. What happened to all of that cash?

**The Witness**: Basically just spent it on everyday anything whether it was shopping, clothes, my children. Of course, they were both at the home at the time. Just the bills. Just everyday. Of course, at the time, you know, if I wanted to go out and buy a new outfit, I went out and bought it. It wasn't just like, you know. So a lot of it just went to everyday items and paying the bills.

**The Court**: In addition to this, though, I am hearing that you would have acquired things that you wanted rather than needed.

**The Witness**: Yes, ma'am. That is true.

**The Court**: Because you had all of that money you stole to do it with; right?

**The Witness**: I bought thing[s] that if I – you know, that I wanted, yes.

After hearing the relevant testimony and considering the evidence in the record, the trial court ordered restitution to Hillside Hospital in the amount of $162,603. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims the trial court ordered her to pay excessive restitution. When the defendant challenges the restitution amount ordered by the trial court, this Court will utilize a *de novo* standard of review with a presumption that the trial court's ruling was correct. T.C.A. § 40-35-401(d) (2006)*; State v. Johnson*, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997). The purpose of ordering restitution is to compensate the victim and to punish and rehabilitate the defendant. *Johnson*, 968 S.W.2d at 885. "In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant

4

to pay or perform." T.C.A. § 40-35-304 (d) (2006); *State v. Bottoms*, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). After all, "[a]n order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim." *Johnson*, 968 S.W.2d at 886. There is "no formula for determining restitution," but the amount must be "reasonable" and "must be based upon the victim's pecuniary loss and the financial condition and obligations of the defendant; and the amount ordered to be paid does not have to equal or mirror the victim's precise pecuniary loss." *Johnson*, 968 S.W.2d at 886; *State v. Smith*, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). Pecuniary loss is defined as "(1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and (2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense." T.C.A. § 40-35-304(e).

When a trial court orders a defendant to serve a sentence of incarceration, as opposed to probation, it lacks the jurisdiction to order a restitution payment plan, and, thus, it may only order a total amount of restitution. *State v. James Lewis Fritz*, No. 02C01-9503-CC-00094, 1995 WL 686112 (Tenn. Crim. App., at Jackson, Nov. 15, 1995) (holding that a trial court lacks jurisdiction to impose restitution payment plans on a defendant it ordered to be incarcerated because the payment methods would be conditions to the defendant's parole, over which the Board of Probation and Paroles has exclusive authority), *no Tenn. R. App. P. 11 application filed*. A defendant ordered to pay restitution "shall be responsible for the payment of the restitution until the expiration of the sentence imposed by the court, and any payment or performance schedule established by the court shall not extend beyond the expiration date." T.C.A.§ 40-35-304(g)(2); *Bottoms*, 87 S.W.3d at 108. "Any unpaid portion of the restitution ordered may be converted into a civil judgment." T.C.A. § 40-35-304(h)(1).

The trial court explained how it arrived at the restitution amount of $162,603 as follows:

> The conflicting testimony of the two witnesses on behalf of Lifepoint and Hillside relative to cash refunds makes it impossible for the Court to distinguish cash refunds to patients with private rooms from the 1200 patients receiving cash refunds. While the Court believes that restitution exceeds $162,603, it is unable to set the restitution any higher with the evidence presented by the State. To do so would amount to pure speculation. Defendant admits that she is able to pay restitution of $162,603, and the Court finds that she is able to pay this sum over the period of parole.

The process for determining a restitution amount is a two-step process: the trial court must first determine the pecuniary loss to the victim, and then it must determine how much of that amount the defendant can reasonably be expected to pay. *See Johnson*, 968 S.W.2d at 886; *State v. Wendell Gary Gibson*, No. M2001-01430-CCA-R3-CD, 2002 WL 1358711, at *3 (Tenn. Crim. App., at Nashville, Jun. 24, 2002), *no Tenn. R. App. P. 11 application filed*. We conclude the trial court properly found that the victim suffered a proven pecuniary loss of $162,603. The Defendant, although not specifically admitting "that she is able to pay restitution of $162,603," as stated by the trial court, did testify that she is "willing to pay back the money." We recognize that there could be

5

a difference between the Defendant's willingness to pay and the Defendant's ability to pay. The Defendant's financial condition was extensively explored at the restitution hearing. The credibility of the Defendant's testimony concerning what she can reasonably be expected to pay, including her explanation as to what happened to the large quantity of cash that she stole, is properly a matter for the trial court to determine. In our view, the trial court carefully considered the evidence presented at the restitution hearing and then determined the pecuniary loss to the victim and the Defendant's financial condition to arrive at the restitution amount of $162, 603. We have carefully reviewed the judgment of the trial court and have found no error.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude the trial court properly ordered the Defendant to pay $162,603 in restitution. We affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE